Opinion
PETERSON, P. J.
Appelants the California Labor Federation, AFL-CIO, a union officer, and individual employees (collectively CLF) contend the trial court erred in concluding that the Industrial Welfare Commission (IWC) acted properly when the IWC amended certain of California’s overtime pay requirements, to make those overtime rules more closely comply with the provisions of federal law. Specifically, CLF contends the IWC erred in generally adopting the federal rule that overtime should be paid to employees when they work more than 40 hours per week, rather than after 8 hours on each workday. CLF contends the IWC exceeded the scope of its legal authority, because CLF contends certain sections of the Labor Code will become inoperative or moot as a result of the IWC’s action. CLF also contends the IWC could not amend its overtime rules, because the Legislature had previously declined to do so. In addition, CLF contends the IWC orders are not supported by an adequate statement of the basis for the IWC action. Finally, CLF contends the IWC could not eliminate the eight-hour overtime rule because the rule had previously existed, subject to various changing exceptions, for seventeen years.
We agree with the trial court’s ruling which rejected these arguments and affirm.
I. Facts and Procedural History
Appellant CLF filed a petition for a writ of mandate in the trial court, seeking to overturn the actions of the IWC in adopting amendments to certain of its wage orders. The amendments in question provide that in certain industries, employees must be paid overtime at a rate of 150 percent of their regular pay rate, i.e., time and a half pay, after forty hours of work in one week, but not necessarily after eight hours of work in any one day as the IWC had generally required, with notable exceptions, during the period from 1980 through 1997.
After extensive briefing and a hearing, the trial court in June 1997 denied the request for a writ of mandate, because it concluded “there is no basis to *986 conclude that the IWC was not free, under California law to modify its Wage Order[s] . . . .” CLF filed a timely notice of appeal. The amendments in question went into effect on January 1, 1998, during the pendency of this appeal.
II. Discussion
We affirm the trial court’s ruling, because we agree with its legal analysis and conclusion that nothing prevented the IWC from changing its overtime rules by amending its wage orders. In order to explain this conclusion more fully, we must first briefly recount the history and role of the IWC, as part of the broader history of the federal and state overtime laws. We then discuss our limited standard of review in this proceeding. Finally, we more specifically address the claimed errors argued by appellant CLF, and conclude we must affirm the trial court’s decision which upheld the IWC orders in issue here.
A. History of the IWC and Federal and State Overtime Rules
In 1913, the IWC was established as a quasi-legislative body of five members appointed by the Governor, with two members being representatives of labor, two members from management, and one public or neutral member. (Labor Code,[1] §§ 70 & 70.1.)
The IWC was initially given jurisdiction to regulate only the working hours of women and minors. In this role, from 1913 to 1973, the IWC ordered that women and minors could not work more than eight hours per day unless they received overtime pay from their employer for each hour worked after eight hours in that day. (See Industrial Welfare Com. v. Superior Court (1980) 27 Cal.3d 690, 700 [166 Cal.Rptr. 331, 613 P.2d 579] (Industrial).)
There was no similar state overtime requirement for adult male workers, although in 1938 those workers were covered by different overtime rules under the provisions of the federal Fair Labor Standards Act of 1938 (FLSA) (29 U.S.C. §§ 201-219). The FLSA requires that most workers, including most adult male workers, must receive overtime pay after working 40 hours per week, but the FLSA does not require overtime pay after any particular number of hours per day, i.e., it does not set a daily overtime rule as the IWC had done for women and minors since 1913. (See 29 U.S.C. § 207(a); 29 C.F.R. § 778.602(a) (1997).) The anomalous result was that women, but not men, had to be paid overtime after eight hours work in any one day.
*987 This disparity in the treatment of overtime pay based upon the sex of the employee led to legal problems, including claims of paternalism and unlawful sex discrimination, especially after the passage in 1964 of title VII of the federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) (Title VII). (See Industrial, supra, 27 Cal.3d at p. 700.)
In Homemakers, Inc., of L. A. v. Division of Indus. Welf. (9th Cir. 1974) 509 F.2d 20, 21-23, the Ninth Circuit Court of Appeals directly held the IWC’s wage orders requiring overtime after eight hours each day were illegal and unenforceable, because they only applied to women, in violation of Title VII.
It became clear that California would, therefore, have to modify its system of overtime regulation. In an attempt to remedy this problem, the California Constitution[2] was amended to provide, in the present article XIV, section 1, that the IWC should have broad jurisdiction over the working conditions of all workers, not simply those of a certain sex or age; that constitutional provision now provides: “The Legislature may provide for minimum wages and for the general welfare of employees and for those purposes may confer on a commission legislative, executive, and judicial powers.” (Italics added.) The Legislature also amended the Labor Code in order to give the IWC jurisdiction over adult male employees, as well as women and children. (See Industrial, supra, 27 Cal.3d at p. 701.)
The IWC then considered, since it must treat all employees equally, whether it should simply conform its overtime rules to the federal 40-hour-week standard for all employees derived from the FLSA, or should instead extend its stricter 8-hour-day rule from women and children to all employees, as a state standard more restrictive than the federal FLSA standard. The IWC decided to modify the eight-hour overtime rule for many industries. This 1974 IWC decision led to more litigation, however; and in 1975, the IWC’s 1974 wage orders were overturned on unrelated procedural grounds by the same trial court whose decision is under review here. (Henning v. Industrial Welfare Com. (Super. Ct. S.F. County, Jan. 20, 1975) (76 Lab. Cas. (CCH) ¶ 53,639).) In that 1975 decision, the trial court accepted the contentions of union representatives that the IWC was required to convene a separate wage board for each industry, rather than convene a consolidated wage board to deal with problems which existed across industry lines.
After that decision, the IWC tried again to enact valid overtime rules. This time, however, while the IWC generally sought to retain the eight-hour *988 overtime rule for all employees, it also included exceptions so that employees could vote to work four days of ten hours each, rather than five days of eight hours, and the employer would not have to pay overtime for employees in a workplace which had voted in favor of such an arrangement. However, in 1979, our Supreme Court invalidated portions of those wage orders in a lawsuit brought by industry representatives, because the IWC had not included an adequate statement of the basis for the IWC’s action. (California Hotel & Motel Assn. v. Industrial Welfare Com. (1979) 25 Cal.3d 200, 213-216 [157 Cal.Rptr. 840, 599 P.2d 31] (California Hotel).)
Therefore, the IWC had to try yet again. In 1980, the IWC promulgated new wage orders, which also retained the eight-hour overtime requirement, but expanded the exceptions to that requirement and made it easier for employees who voted for this option to work a four-day week rather than a five-day week. (Industrial, supra, 27 Cal.3d at pp. 712-713.) Those orders were ultimately upheld by our Supreme Court in Industrial. (P. 735.)
In 1986, the IWC added yet more amendments designed to make it easier for employees to vote for a four-day rather than five-day week, and even allowed certain employees, such as those who work in hospitals, to vote for and adopt a workweek in which they would work three days of twelve hours per day, without overtime. This is a subject we will have occasion to revisit later in this opinion. Also, in the years between 1986 and 1993, the IWC considered dropping the eight-hour day entirely so as to conform its overtime rules to the FLSA forty-hour-week standard, but decided not to do so at that time. Instead, it added yet more exceptions and provisions allowing employees in various industries to adopt workweeks with longer hours per day and fewer days, without payment of overtime.
In 1994, the Northridge earthquake in Southern California destroyed highways and disrupted commute patterns for millions of workers, increasing the demand for more flexible work schedules and shorter workweeks with more hours of work per day, to reduce commuting time. Consequently, Governor Wilson promulgated executive orders which temporarily suspended the IWC daily overtime rules in the affected areas.
When the emergency conditions created by the Northridge quake ended, the Governor rescinded his executive orders which had overturned the IWC overtime rules; he also called on the Legislature to pass legislation which would overturn the IWC eight-hour overtime rule on a permanent basis. However, the legislation failed on a tie vote in the Assembly Labor and Employment Committee, so the Governor petitioned the IWC itself to reconsider its eight-hour overtime rule.
*989 In 1995, the IWC decided to explore the possibility of taking such action, and the IWC accordingly held numerous public meetings on the issue during 1995 through 1997.
In April 1997, the IWC promulgated the wage order amendments in question here, which amend certain of the wage orders to eliminate the eight-hour-day overtime requirement, while preserving the requirement for overtime after forty hours in a workweek, in accordance with the FLSA standard.[3]
B. Standard of Review
(1) As our Supreme Court has held, in proceedings challenging orders of the IWC, a reviewing court’s scope of review is very limited: “Judicial authorities have repeatedly emphasized that in fulfilling its broad statutory mandate, the IWC engages in a quasi-legislative endeavor, a task which necessarily and properly requires the commission’s exercise of a considerable degree of policy-making judgment and discretion. [Citations.] [¶] Because of the quasi-legislative nature of the IWC’s authority, the judiciary has recognized that its review of the commission’s wage orders is properly circumscribed. As the Court of Appeal noted in Rivera [v. Division of Industrial Welfare (1968)] 265 Cal.App.2d 576, 594 [71 Cal.Rptr. 739]: ‘A reviewing court does not superimpose its own policy judgment upon a quasi-legislative agency in the absence of an arbitrary decision; rather, the review is limited to an examination of the proceedings to determine whether the action is arbitrary or entirely lacking in evidentiary support or whether the agency has violated the procedure required by law; in these technical matters requiring the assistance of experts and the collection and study of statistical data, courts let administrative boards and officers work out their problems with as little judicial interference as possible.’ . . .” (Industrial, supra, 27 Cal.3d at p. 702; accord, California Hotel, supra, 25 Cal.3d at pp. 211-212 [“The courts exercise limited review of legislative acts by administrative bodies out of deference to the separation of powers between the Legislature and the judiciary, to the legislative delegation of administrative authority to the agency, and to the presumed expertise of the agency within its scope of authority.”].)
*990 C. The IWC Acted Properly
Appellant CLF contends the IWC erred and exceeded the scope of its authority in amending certain of its own prior wage orders, so as to delete the requirement of overtime pay after eight hours of work per day, and so as to conform those overtime rules to the federal forty-hour-week standard under the FLSA.
First, CLF contends the IWC exceeded the scope of its legal authority, because CLF contends certain sections of the Labor Code will become inoperative or moot as a result of the IWC’s action. Next, CLF contends the IWC could not amend its overtime rules, because the Legislature had previously declined to do so. Next, CLF contends the IWC orders are not supported by an adequate statement of the basis for the IWC action. Finally, CLF suggests the IWC could not amend the eight-hour overtime rule because it had previously existed, in various forms, for seventeen years.
We agree with the trial court that the IWC acted properly here, and we affirm the trial court’s rejection of CLF’s challenges to the IWC’s actions. Under the provisions of both Constitution, article XIV, section 1—which gives the IWC plenary jurisdiction over wages and the welfare of employees—and section 1173—which gives the IWC the power to “amend or rescind” its prior orders on these subjects—the IWC acted properly.
1. Claimed Inoperability or Mootness of Labor Code Provisions
a. Section 1182.9
First, CLF contends the IWC could not amend its prior wage orders so as to eliminate the requirements the IWC had previously imposed for payment of overtime after eight hours per day, because this would conflict with or render moot the provisions of section 1182.9. It provides that operators of licensed hospitals—who, pursuant to an exception in the prior, now amended, orders of the IWC, implement a workweek of three days lasting twelve hours each without paying overtime—must attempt to accommodate employees who do not desire to work such a schedule. We see no necessary conflict between the IWC actions and the provisions of section 1182.9 and, in fact, believe they are consistent with each other in allowing greater flexibility of work schedules, although we agree the specific conditions attached to section 1182.9 are mooted by the IWC’s action.
*991 Section 1182.9 was enacted in 1986 (i.e., long before the wage orders were amended by the IWC actions in issue here) and provides in relevant part: “An employer engaged in the operation of a licensed hospital. . . who institutes, pursuant to an applicable order of the \IWC\, a regularly scheduled workweek that includes no more than three working days of no more than 12 hours each within any workweek, shall make a reasonable effort to find an alternative work assignment for any employee who participated in the vote which authorized the schedule and is unable to work 12-hour workday schedules. An employer shall not be required to offer an alternative work assignment to an employee if an alternative work assignment is not available or if the employee was hired after the adoption of the 12-hour, 3-day workweek schedule.” (Italics added.)
It is obvious from reading section 1182.9, and especially from reading the portions we have italicized, that it was designed to come into play under the old IWC orders, when a three-day workweek is enacted pursuant to a vote by hospital employees, which authorized the schedule, and an applicable exception in the prior orders of the IWC which authorized voting by hospital employees to enact such a schedule.
As the trial court properly ruled, there is no necessary conflict between section 1182.9 and the IWC order in issue here. It is true, as CLF contends, that under the amended IWC orders in issue here, employees, including hospital employees, need no longer enact such a work schedule by vote and, therefore, section 1182.9 would appear to be moot as a practical matter. However, the Legislature certainly knew when it enacted section 1182.9 that the IWC could amend its wage orders, since the Legislature theretofore gave the IWC this power in section 1173. The Legislature also specifically made section 1182.9 operative only when an “applicable order” of the IWC provided for the adoption of such a work schedule by employee vote.[4] We perceive no necessary conflict between the provisions of section 1182.9 and the IWC orders in issue here, because there no longer is any “applicable order” which requires such a vote. If there is no applicable order and no employee vote, section 1182.9 cannot be violated, and is simply irrelevant to the question of whether the IWC should require overtime after eight hours. Moreover, under the limited and deferential standard of review we must apply, we cannot overrule the IWC’s decision on the basis of section 1182.9, *992 which certainly did not enact an eight-hour overtime requirement, and instead was predicated upon the absence of such a requirement as a result of employée vote. (See Industrial, supra, 27 Cal.3d at p. 702; accord, California Hotel, supra, 25 Cal.3d at pp. 211-212.) If the Legislature had enacted an explicit requirement that overtime must be paid after eight hours work per day, we would enforce such a law. Section 1182.9 is not such a law.
b. Section 1183.5
For the same reasons, we conclude, as did the trial court, that we cannot overturn the IWC’s actions based upon the provisions of section 1183.5, which sets requirements for employee elections used to enact a flexible workweek under certain exceptions in the old, unamended IWC wage orders. Section 1183.5, also enacted in 1986, provides in pertinent part: “Any employer who intends to use a flexible scheduling technique, as permitted by an order of the [IWC], requiring a vote of the affected employees shall make a full disclosure in writing to each of the affected employees. . . .” (Subd. (a), italics added.) In essence, this section provides that if an election is held pursuant to an exception in an IWC order, certain information must be provided to employees about the contemplated new work hours.
It is again obvious that this statute is also applicable only to employee elections pursuant to the old, unamended orders of the IWC, which now need not occur under the new, amended IWC orders under review here. Section 1183.5 is simply irrelevant here, because it did not purport to establish a statutory requirement that overtime shall be paid after eight hours per day. The Legislature has left that issue, thus far, to the IWC, which has a carefully balanced membership and a neutral public member to break ties between employer and employee representatives. We also cannot overrule the IWC action in this case merely because of a contention that the wisdom of the action might be debatable. (See Industrial, supra, 27 Cal.3d at p. 702; accord, California Hotel, supra, 25 Cal.3d at pp. 211-212.)
2. Lack of Relevant Enactments by the Legislature
Next, CLF contends the IWC could not enact these amendments to its own overtime rules, because the Legislature had not done so. This argument not only misperceives the proper role of the IWC and the Legislature, it is totally inconsistent with the limited scope of our judicial review of IWC action.
*993 The Constitution and the Legislature have established the IWC, have given it a carefully balanced membership, and have granted it a quasi-legislative jurisdiction over the issue of overtime, among other issues. (See Industrial, supra, 27 Cal.3d at p. 702; accord, California Hotel, supra, 25 Cal.3d at pp. 211-212.) The Legislature may, of course, enact an enforceable law which overrules any action by the IWC. However, we cannot overrule the IWC’s action based upon legislative inaction, in the face of the Legislature’s clear delegation of authority to the IWC to enact wage orders on these issues.
Appellant CLF also contends the failure in the Legislature of Governor Wilson’s attempt to secure legislative repeal of the IWC’s eight-hour-day overtime rule discloses a legislative intent to maintain the status quo, and that after the failure of such an attempt the IWC could never amend its own overtime rules accordingly. This argument is a very weak one, for a number of reasons. First, it is impossible for us to clearly determine legislative intent from this mere nonaction. (See Granberry v. Islay Investments (1995) 9 Cal.4th 738, 746 [38 Cal.Rptr.2d 650, 889 P.2d 970] [“As we have often observed, ‘Unpassed bills, as evidences of legislative intent, have little value.’ ”].) Moreover, the Legislature may have failed to act, on a tie vote in an Assembly committee, simply because at the time the Assembly was organized in such a way that each party had equal representation in committees, without a tie-breaking neutral public member such as the IWC enjoys; and the Legislature was willing to leave this issue to an appointed commission. Certainly it would not be the first time a Legislature deferred to a commission it had created on such a contentious issue.
In sum, the Legislature did not validly enact a law requiring overtime pay to employees after eight hours of work per day that the judiciary may enforce.
CLF suggests the IWC action was somehow invalid because the Governor had petitioned the IWC to enact these amendments to its overtime rules, and the Governor’s request assertedly violated the doctrine of the separation of powers. It is very difficult to understand this argument. The IWC is in this respect a quasi-legislative body, which has been given legislative powers by the Legislature. (Const., art. XIV, § 1; see also § 1173.) Just as constituents, citizens, and other public officials may approach the Legislature with requests for action, the IWC may be sought out and petitioned to take action *994 by representatives of labor, management, or members of the public who are concerned about matters within its jurisdiction. (§ 1173.) We will not hold that the Governor of California is the only person in this state forbidden to petition the IWC to take action on an issue within its jurisdiction.
Next, CLF urges us to take judicial notice of, and base our ruling upon, the fact that the Legislature sought to overturn the IWC’s action, which legislation was not enacted because it was vetoed by the Governor, and the veto was not overridden. In a case not cited by the parties, our Supreme Court recently rejected such an argument based upon the Legislature’s passage, and the Governor’s veto, of other employment-related legislation. (Snyder v. Michael’s Stores, Inc. (1997) 16 Cal.4th 991, 1003 & fn. 4 [68 Cal.Rptr.2d 476, 945 P.2d 781] (Snyder).)
In Snyder, our high court had before it the question of whether a fetus in útero was an “employee” for purposes of workers’ compensation coverage, a contention which the court aptly rejected by observing: “This novel theory, on first encounter merely implausible, proves on further examination to be utterly without merit.” (16 Cal.4th at p. 1003, fn. omitted.)
In addition, in response to the parties’ arguments regarding the conflicting inferences which might be drawn from legislative inaction, after the Legislature passed but the Governor vetoed legislation designed to overrule the contrary decision by Division Three of the First Appellate District in Bell v. Macy’s California (1989) 212 Cal.App.3d 1442 [261 Cal.Rptr. 447] (Bell) and codify a new rule, Snyder declined to attach any weight to those vetoed legislative efforts, observing that such a “claim of legislative inaction is truly a ““ “weak reed upon which to lean.” ”” ” (16 Cal.4th at p. 1003, quoting from People v. Escobar (1992) 3 Cal.4th 740, 751 [12 Cal.Rptr.2d 586, 837 P.2d 1100].)
Most significantly here, in Snyder, Justice Werdegar’s opinion for the high court observed: “The parties draw conflicting inferences from the fact that in 1991 the Legislature passed a bill, which was vetoed by the Governor, to abrogate Bell. [Citation.] On reflection, we are unable to draw any relevant inference from this event; it provides no guidance on whether the political branches approved or disapproved of Bell’s holding as an interpretation of the existing statutes.” (16 Cal.4th at p. 1003, fn. 4.) We agree and apply that *995 ruling here. (See Auto Equity Sales, Inc. v. Superior Court (1962) 57 Cal.2d 450, 455 [20 Cal.Rptr. 321, 369 P.2d 937] .)[5]
Moreover, it was already well established that we may not take judicial notice of unenacted legislation for the purpose of giving effect to that legislation in spite of the Governor’s veto. (See, e.g., Baldwin v. County of Tehama (1994) 31 Cal.App.4th 166, 181, fn. 10 [36 Cal.Rptr.2d 886] [Per Blease, J., the court refused to take judicial notice of vetoed legislation as a means to determine alleged legislative intent: “The argument invites us to read legislative history tea leaves; we decline the invitation. . . . The request for judicial notice is denied.”].) By previous order, we have denied appellant’s similar request in this case for judicial notice of vetoed legislation. We reaffirm that denial here.
In addition, we observe that CLF’s argument in this respect is inconsistent with the Constitution’s provisions respecting a veto by a Governor, which may only be overridden by a two-thirds vote of the Legislature, and may not be overridden by a court on judicial review. Article IV, section 10 of the Constitution provides in pertinent part: “Each bill passed by the Legislature shall be presented to the Governor. It becomes a statute if it is signed by the Governor. The Governor may veto it by returning it with any objections to the house of origin, which shall enter the objections in the journal and proceed to reconsider it. If each house then passes the bill by rollcall vote entered in the journal, two thirds of the membership concurring, it becomes a statute.” (Subd. (a).) If we were to follow CLF’s suggestion and take judicial notice of the vetoed bill in order to allegedly ascertain legislative intent, and then give effect to that asserted intent by adopting the result vetoed by the Governor, we would be blatantly disregarding the explicit provisions of the Constitution by creating a judicial override of a Governor’s veto. We repeat that the Legislature, not a court, has the power under the Constitution, to overturn the IWC’s action by validly enacting legislation which does so. (Art. XIV, § 1.) Our constitutional judicial power does not extend to the overriding of a Governor’s veto. (Const., art. VI, §§ 10-13.)
Moreover, we cannot accept CLF’s argument that we can overturn the IWC action as a result of events short of validly enacted legislation, such as *996 a Senate resolution protesting the IWC action, or the Legislature’s action in removing from office some IWC members who voted in favor of the action, or the Legislature’s attempt to remove appropriated funds earmarked for the costs of promulgating these amendments.
A resolution not presented to the Governor for signature, by definition, is not an enacted law which may take effect pursuant to article IV, section 10 of the Constitution. Similarly, removal of the IWC members who voted a particular way does not overturn the legislative actions they took while in office, just as the removal of particular legislators would not overturn legislation they had already enacted. Thus far, legislative attempts to actually reverse the IWC’s action or codify the former eight-hour overtime rule have failed to be validly enacted. In addition, the removal of an appropriation from a spending bill, while effective in preventing the IWC from spending the earmarked funds which would otherwise have been appropriated, obviously did not prevent the IWC from taking this action using other funds and, in any event, is not an enacted law establishing a rule that overtime must be paid after eight hours per day.
It is apparent that there may have been considerable political jockeying and posturing by parties to the long-running political dispute on this issue, which has continued to this day in this lawsuit. However, there is as yet no enacted law by the Legislature establishing such a requirement, and we may not enact one ourselves. (Const., art. IV, § 10.) We are, accordingly, required to uphold the IWC action in issue here.
3. Statement of Basis
Next, CLF contends the IWC did not provide an adequate statement of the basis for its action. This argument is easily disposed of in the context of the present case.
Section 1177 provides in relevant part: “Each order of the [IWC] shall include a statement as to the basis upon which the order is predicated . . . .”
The IWC, in fact, adopted a very lengthy statement of the basis for its actions here, which covers eight typed pages and is too long to set forth here in full. The statement of basis exhaustively covers the relevant facts, details the process of investigation and public hearings which led the IWC to take the action in question, and explains the IWC’s reasoning. This statement of basis amply supports the IWC’s action here.
*997 A statement of basis by the IWC need only provide “an explanation of how and why the [IWC] did what it did.” (California Hotel, supra, 25 Cal.3d at p. 213; accord, Industrial, supra, 27 Cal.3d at p. 711.) The statement of basis need not be a totally exhaustive document, and “is not the equivalent of the findings of fact that a court may be required to make.” {Ibid.) Therefore, the IWC was not required to make findings of fact on subsidiary, tangentially related issues or alternative suggestions, as CLF contends.
The statement of basis fully explores the reasoning of the IWC in taking the action in question. In attempting to require more, CLF “seeks to read into section 1177 unreasonably burdensome requirements that are basically incompatible with the [IWC’s] quasi-legislative task.” {Industrial, supra, 27 Cal.3d at p. 710.)
This is especially true because CLF’s specific claims of error relate to the fact that CLF contends IWC did not devote sufficient attention in its statement of basis to issues which we conclude were either irrelevant, or at most only very marginally relevant, to its decision. CLF principally contends IWC did not sufficiently discuss the interplay of its decision with the provisions of sections 1182.9 and 1183.5, which we have discussed fully above and have concluded were irrelevant here. CLF also contends the IWC statement did not make a sufficient finding of fact that working longer hours per day, but the same number of hours per week, at regular pay rates rather than overtime rates, would not be unduly detrimental to those employees affected by the overtime changes,[6] which now conform California law to federal law and the laws of almost all other states where the federal overtime rules have been in effect since 1938 with no particular untoward consequences for employees. Under the deferential standard of review we must apply, we conclude such an explicit finding of fact on a tangentially related subsidiary issue, which is rather obviously implied by the IWC’s extensive statement of basis in any event, would be unduly burdensome and was not required in the IWC’s statement of basis when it acted in this quasi-legislative role. (See Industrial, supra, 27 Cal.3d at p. 710.)
4. Valid Amendment to Prior Overtime Rules
Finally, CLF seems to suggest that the IWC could not take the action it did, simply because this would repeal an allegedly long-standing *998 rule in California which favored some employees, even though the rigidities of the overtime rules inconvenienced other employees. However, as we have shown above, in fact, there has never been a time when all California employees were covered by the eight-hour overtime rule. The rule was already riddled with so many exceptions that it was increasingly in danger of being swallowed by those exceptions in any event; and the rule itself only existed, in various forms, for 17 years, and arguably came into being, inter alia, as a result of an apparent series of historical accidents. In any event, the IWC obviously has jurisdiction under both the Constitution and statute to promulgate new rules on matters within its jurisdiction, including amendments to rules already promulgated. (Const., art. XIV, § 1; see also § 1173, 2d par. [The IWC may “amend or rescind any order or portion of any order or adopt an order concerning any occupation, trade or industry . . . .”].)
Until 1913 there was no IWC, and there were no IWC overtime rules at all in California. From 1913 to 1973 there were paternalistic eight-hour overtime rules for women and minors, but not for the male adult employees who at that time composed the vast bulk of the workforce employed outside the home. As a matter of federal law, the FLSA from 1938 to the present, as well as the laws of at least 46 other states, contained no such 8-hour overtime requirement.
When California’s overtime rules were invalidated for violating Title VII and were reenacted in a gender-neutral form, the IWC decided not to enact an eight-hour overtime requirement. However, that decision did not go into effect because of an unrelated procedural error by the IWC, and then the issues were in litigation until 1980. (See Industrial, supra, 27 Cal.3d at pp. 697-699.)
From 1980 to 1997, a compromise was in effect, with a nominal eight-hour overtime rule, always subject to various exceptions, which exceptions multiplied over the years as the rigidities of the nominal rule appeared increasingly out of step with the desire of workers and employers for more flexible workweeks composed of a lesser number of workdays, with longer work hours on those days.
Eventually, the IWC, pursuant to the power granted it under section 1173 to amend or rescind its orders, decided to rethink this series of historical accidents, which had resulted in a rather strange patchwork of overtime policies, difficult to justify both when considered in isolation and in light of present workday realities, and suffering by comparison with the clear and *999 simple rules of the federal government and almost all other states. The eight-hour overtime rule proves to be impossible to rationalize as necessary for public protection, because neither the federal government nor the vast majority of other states has found it necessary for purposes of public protection. In addition, it was difficult to discern the true rationale of the California regulations, because even within their own framework they did not apply to a vast number of employees who were fitted into various exceptions or contrary rules. For instance, the eight-hour overtime rule already did not apply to hospital employees who had voted for a three-day workweek, all other employees who had previously voted for shorter workweeks, union members and other employees working pursuant to the terms of collective bargaining agreements,[7] managers, professional employees such as doctors and lawyers, state employees,[8] and so on.
The unfortunate result of all this litigation, rulemaking, and exception-making activity was a Winchester Mystery House of regulations, with such a muddled rationale and so many accretions and exceptions added over the years that the rationality of the regulatory program was indeed, at the very least, fairly debatable.
CLF ultimately implies the IWC did not have the authority to amend its rules because our Supreme Court had previously found the IWC had the authority to initially promulgate them, in Industrial, supra, 27 Cal.3d at page 735. This argument is without merit. Our Supreme Court in Industrial held the IWC had the quasi-legislative authority to enact regulations in this area, and that the courts on review lacked authority to overturn such regulations because they were within the primary quasi-legislative authority of the IWC. (See ibid.) We agree, and apply that holding.
Subsequently, therefore, when the IWC decided to clean out its mare’s nest of bureaucratic regulations, and acted to more closely conform its own IWC rules on eight-hour overtime with the clear and simple rules of applicable federal law and the laws of almost all other states, the IWC also acted within its constitutional and statutory authority; and we may not overturn that quasi-legislative action. (See Industrial, supra, 27 Cal.3d at p. 702.)
*1000 In conclusion, the trial court quite properly found no legal impediment to the IWC’s decision finally to cut through this particular Gordian knot of overtime rules by amending its wage orders and eliminating its eight-hour daily overtime rule.
III. Disposition
The order of the trial court denying the petition for writ of mandate is affirmed.
Haning, J., and Jones, J., concurred.
Appellants’ petition for review by the Supreme Court was denied July 22, 1998. Mosk, J., was of the opinion that the petition should be granted

Unless otherwise indicated, all subsequent statutory references are to the Labor Code.

All subsequent constitutional references are to the California Constitution.

The IWC’s action amended five of its industry wage orders, including Wage Order No. 1-98, the wage order governing overtime pay in the manufacturing industry (Cal. Code Regs., tit. 8, § 11010); Wage Order No. 4-98, generally governing technical workers (id., § 11040); Wage Order No. 5-98, governing public housekeeping workers (id., § 11050); Wage Order No. 7-98, governing mercantile workers (id., § 11070); and Wage Order No. 9-98, governing transportation workers (id., § 11090).

CLF’s reliance on Henning v. Industrial Welfare Com. (1988) 46 Cal.3d 1262 [252 Cal.Rptr. 278, 762 P.2d 442] is misplaced. In Henning, the Legislature did enact new legislation to overrule the IWC’s orders relating to credits for tips. (Pp. 1280-1281.) Here, by contrast, section 1182.9 did not establish an eight-hour-day rule, and was made contingent upon an “applicable order” of the IWC allowing employers to avoid the eight-hour-day rule.

CLF, however, seeks to rely instead on Justice Werdegar’s opinion, filed four months after Snyder, in Stop Youth Addiction, Inc. v. Lucky Stores, Inc. (1998) 17 Cal.4th 553, 571, fn. 9 [71 Cal.Rptr.2d 731, 950 P.2d 1086]. In Lucky Stores, Justice Werdegar took judicial notice of enacted legislation and an unpassed bill, as relevant to show lack of legislative action on a certain point. Here, the unenacted bills would not be relevant under Snyder because, as in that case, those bills, unenacted by reason of the Governor’s veto, do not and cannot provide “guidance on whether the [executive and legislative] branches . . .” intended to change the IWC’s orders. (16 Cal.4th at p. 1003, fn. 4.)

CLF, for example, alleges the statement of basis for IWC’s action was inadequate, inter alia, because it ignored the hypothetically “essential issued” of Whether a “24 hour[]” day was detrimental to employees.

Although CLF, a labor organization, is bringing this lawsuit challenging the IWC’s action, union members, such as members of the labor organizations composing CLF, who work pursuant to their unions’ collective bargaining agreements, would not be directly affected one way or the other by the IWC action, because they are already subject to an applicable “collective bargaining agreement” exception thereto in any event. (See, e.g., IWC Wage Order No. 1-98, § 3, subd. (D) [Cal. Code Regs., tit. 8, § 11010].)

If the true purpose of the overtime rules was public protection, one would logically have to conclude the state left its own employees unprotected: The employees who typed up all these regulations were not covered by them.